Kenneth D. Friedman
Arunabha Bhoumik (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York, New York 10036
Tel.: (212) 790-4500
Facsimile: (212) 790-4545
*Attorneys for Shri Kartikeya Pharma and Ixoreal Biomed Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATREON, INC.,<br><br>   Plaintiff,<br><br> v.<br><br>IXOREAL BIOMED INC. and SHRI KARTIKEYA PHARMA, LTD.,<br><br>   Defendants. | Civil Action No. 3:16-cv-04735 (FLW) (DEA)<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS AND STRIKE** |
| SHRI KARTIKEYA PHARMA, LTD.,<br><br>   Counterclaimant,<br><br> v.<br><br>NATREON, INC.,<br><br>   Counterclaim Defendant. | |
| SHRI KARTIKEYA PHARMA, LTD.,<br><br>   Third-Party Plaintiff,<br><br> v.<br><br>NUTRAGENESIS LLC,<br><br>   Third-Party Defendant. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTS AND PROCEDURAL HISTORY ......................................................... 3

    A.    The Parties ................................................................................... 3

    B.    Natreon's and NutraGenesis's False Advertising Claims Regarding Sensoril ........................................................................ 4

    C.    Natreon Suggests That SKP Engage in Price Collusion with Natreon, and Other Acts of Unfair Competition by Natreon and NutraGenesis ......................... 5

    D.    The Current Litigation ................................................................ 6

ARGUMENT ....................................................................................................... 8

I.     DEFENDANTS PROPERLY PLEAD FAILURE TO MITIGATE DAMAGES AS AN AFFIRMATIVE DEFENSE ................................................. 8

II.    NATREON CANNOT MEET ITS BURDEN UNDER RULE 12(F) TO SHOW THAT SKP'S FACTUAL ALLEGATIONS WILL NOT HAVE ANY POSSIBLE BEARING ON THIS LITIGATION ......................................... 9

    A.    SKP's Statements Regarding Sensoril's Price Are Pertinent ............................ 10

    B.    Allegations Regarding Natreon's Efforts to Collude with SKP Are Relevant to SKP's Claims of Unfair Competition, Including SKP's Allegation That Natreon Is Acting Willfully ................................. 10

    C.    Allegations of Deceptive Conduct Are Proper Under Rule 12(f) ..................... 13

    D.    The Litigation Privilege Does Not Bar SKP's Statements Regarding Plaintiffs' Pre-litigation Threats ................................................ 13

III.   SKP HAS STANDING TO BRING A CLAIM UNDER THE CFA ............................. 15

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
  437 F. Supp. 2d 273 (D.N.J. 2006) .................................................................15

*Allen v. V & A Bros.*,
  208 N.J. 114 (2011) ........................................................................................17

*Arc Networks, Inc. v. Gold Phone Card Co.*,
  333 N.J. Super. 587 (Monmouth Cty. 2000).....................................................18

*Avaya, Inc. v. Cisco Sys.*,
  No. 10 Civ. 5881, 2012 WL 2065536 (D.N.J. June 7, 2012) ...............................14

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*,
  49 F. Supp. 2d 750 (D.N.J. 1999) ...................................................................15

*Bosland v. Warnock Dodge, Inc.*,
  197 N.J. 543 (2009) ........................................................................................16

*Bristol–Myers Squibb Company v. Ivax Corporation*,
  77 F. Supp. 2d 606 (D.N.J. 2000)........................................................................9

*CareFusion Corp. v. Medtronic Spine LLC*,
  No. 10 Civ, 01111, 2010 WL 4509821 (N.D. Cal. November 1, 2010)................15

*CFTC v. Rosenberg*,
  85 F. Supp. 2d 424 (D.N.J. 2000) ........................................................ 11-12, 13

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
  No. 10 Civ. 453, 2010 WL 5239238 (D.N.J. Dec. 16, 2010) ....................12, 13, 16

*City of New York v. Smokes-Spirits.Com, Inc.*,
  12 N.Y.3d 616 (N.Y. 2009) ..............................................................................18

*Comdyne I, Inc. v. Corbin*,
  908 F.2d 1142 (3d Cir. 1990)...........................................................................2, 8

*Del. Health Care, Inc. v. MCD Holding Co.*,
  893 F. Supp. 1279 (D. Del. 1995)....................................................................9, 15

*Dello Russo v. Nagel*,
  358 N.J. Super. 254 (N.J. App. Div. 2003)........................................................14

*Eisai Co. v. Teva Pharm. USA, Inc.*,
  629 F. Supp. 2d 416 (D.N.J. 2009) ..................................................................8, 9

*F.T.C. v. Actavis, Inc.*,
  133 S. Ct. 2223 (2013)......................................................................................10

## TABLE OF AUTHORITIES
### (continued)

Page

*Fluid Control Prod., Inc. v. Aeromotive, Inc.,*
  No. 4:09 Civ. 1667, 2010 WL 427765 (E.D. Mo. February 1, 2010)......................................9

*Frugis v. Bracigliano,*
  177 N.J. 250 (N.J. 2003) .......................................................................................................16

*Garden State Equities, Inc. v. Ross,*
  No. 05 Civ. 0085, 2006 WL 1128707 (D.N.J. Mar. 31, 2006) .........................................13, 15

*Garlanger v. Verbeke,*
  223 F. Supp. 2d 596 (D.N.J. 2002) .......................................................................................8, 9

*Gen. Dev. Corp. v. Binstein,*
  743 F. Supp. 1115 (D.N.J. 1990) ...........................................................................................15

*Gomez v. Jacobo Farm Labor Contractor, Inc.,*
  No. 15 Civ. 1489, 2016 WL 6143342 (E.D. Cal. May 20, 2016).............................................8

*Hardwicke v. Am. Boychoir Sch.,*
  188 N.J. 69 (2006) .................................................................................................................17

*Harvard v. Bushberg Bros., Inc.,*
  137 N.J. Super. 537 (N.J. App. Div. 1975).............................................................................8

*Hawkins v. Harris,*
  141 N.J. 207 (N.J. 1995) ........................................................................................................14

*In re Khalil,*
  578 F.3d 1167 (9th Cir. 2009) ................................................................................................12

*Interlink Prod. Int'l, Inc. v. F & W Trading LLC,*
  No. 15 Civ. 1340, 2016 WL 1260713 (D.N.J. Mar. 31, 2016) ...............................................15

*Kimmelman v. Henkels & McCoy, Inc.,*
  108 N.J. 123 (N.J. 1987) ........................................................................................................16

*L.M. ex rel. H.M. v. Evesham Twp. Bd. of Educ.,*
  256 F. Supp. 2d 290 (D.N.J. 2003) ........................................................................................16

*Lemelledo v. Beneficial Mgmt. Corp. of Am.,*
  150 N.J. 255 (1997) ...............................................................................................................16

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.,*
  431 F.3d 353 (9th Cir. 2005) ..................................................................................................15

*Martin Marietta Corp. v. New Jersey Nat. Bank,*
  653 F.2d 779 (3d Cir. 1981).....................................................................................................8

*McGraw v. Johnson,*
  42 N.J. Super. 267 (N.J. App. Div. 1956)................................................................................8

## TABLE OF AUTHORITIES
### (continued)

Page

*Merin v. Maglaki*,
   126 N.J. 430 (N.J. 1992) ............................................................................16

*Resolution Trust Corp. v. Farmer*,
   823 F. Supp. 302 (E.D. Pa. 1993) ................................................................8

*Romag Fasteners, Inc. v. Fossil, Inc.*,
   29 F. Supp. 3d 85 (D. Conn. 2014) ..............................................................9

*Rossi v. Standard Roofing*,
   156 F.3d 452 (3d Cir. 1998) .......................................................................11

*Samra v. Johal*,
   No. 09 Civ. 0171, 2010 WL 55856 (W.D. Wash. January 5, 2010) ..............12-13

*Tonka Corp. v. Rose Art Industries, Inc.*,
   836 F. Supp. 200 (D.N.J. 1993) .....................................................8, 9, 10, 15

*United States v. Curtin*,
   489 F.3d 935 (9th Cir. 2007) ......................................................................11

*United States v. Jannotti*,
   673 F.2d 578 (3d Cir. 1982) .......................................................................11

*United States v. Jewell*,
   614 F.3d 911 (8th Cir. 2010) ......................................................................12

*United States v. O'Leary*,
   739 F.2d 135 (3d Cir. 1984) .......................................................................12

*United States v. Spillone*,
   879 F.2d 514 (9th Cir. 1989) ......................................................................11

*Velez v. City of Jersey City*,
   180 N.J. 284 (2004) ...................................................................................17

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
   763 F.3d 273 (3d Cir. 2014) .........................................................................8

*Weisler v. Safeco Ins. Co. of Illinois*,
   No. 14 Civ. 81107, 2015 WL 11281290 (S.D. Fla. April 9, 2015) ..................8

*Williams v. Kenney*,
   379 N.J. Super. 118 (N.J. App. Div. 2005) ...................................................14

## STATUTES

N.J. Stat. Ann. § 56:8-1 ....................................................................................17

N.J. Stat. Ann. § 56:8-1(c) ...............................................................................19

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

N.J. Stat. Ann. § 56:8-1(d) ............................................................................17

N.J. Stat. Ann. § 56:8-2 ..........................................................................3, 7, 15

N.J. Stat. Ann. § 56:8-19 ............................................................................17

N.J. Stat. Ann. § 56:8-22 ............................................................................17

N.J. Stat. Ann. § 56:8-67 ............................................................................18

New York General Business Law § 349(h) ....................................................18

Penn. Stat. § 201-9.2 ..................................................................................18

### RULES

Fed. R. Civ. P. 12(f) .......................................................................... passim

Fed. R. Ev. 403 ........................................................................................13

Fed. R. Ev. 404 ...................................................................................12, 13

Defendant-Counterclaimant Shri Kartikeya Pharma ("SKP") and Defendant Ixoreal Biomed, Inc. ("Ixoreal") (collectively, "Defendants") submit this Memorandum of Law in opposition to Plaintiff-Counterclaim Defendant Natreon, Inc.'s ("Natreon") motion to strike Defendants' Eighth Affirmative Defense, dismiss Defendant's counterclaim, and strike certain portions of Defendant's pleadings.

## PRELIMINARY STATEMENT

Natreon baldly protests that SKP has filed a "baseless" Counterclaim based on "confusing" allegations.  But SKP's claims are straightforward.  SKP alleges that:  (i) Natreon advertises that Sensoril is manufactured using a "totally aqueous" extraction process; (ii) Natreon advertises that its process for manufacturing Sensoril is protected by various patents (the "Natreon Patents"); (iii) the Natreon Patents describe a method for extracting ashwagandha extract using alcoholic solvents and chloroform – in other words, a process that is not "totally aqueous"; and (iv) therefore, Natreon's advertising is false. Natreon also falsely advertises that the process for manufacturing Sensoril is protected by a European patent; that patent does not exist.  Further, Natreon makes a variety of unsupported advertising claims regarding Sensoril's health benefits.  Far from being "baseless," these allegations are detailed in SKP's Counterclaim and are supported with documentary evidence attached thereto.

Natreon's wrongful conduct is just part of a long history of deceptive and unfair competitive practices by Natreon.  For example, Natreon has, on at least three occasions, attempted to obtain confidential information from SKP by pretending to be a potential customer, including using a fake email address and phony business cards to mask any association with Natreon.  In addition, in 2013, Natreon's CEO, Dr. Sanni Raju, initiated a meeting with SKP's principals at which Dr. Raju attempted to collude with SKP on pricing.

Natreon has also repeatedly threatened baseless litigation against SKP in an effort to scare SKP from the market.  In 2011, Natreon falsely asserted that SKP was infringing on Natreon's patents.  SKP asked Natreon to explain the basis for its patent infringement allegations, but Natreon never provided support for its claims.  In 2013, Natreon falsely asserted, through counsel, that SKP was disparaging Sensoril in SKP's marketing.  When SKP responded that it believed that its marketing was truthful, Natreon dropped its allegation, stating that it considered the matter "closed."

Natreon seeks to strike these material allegations from SKP's Counterclaim, hyperbolically arguing that SKP is "spewing hateful and unsupportable inflammatory and confusion allegations" that "reflect cruelly upon the moral character" of Natreon's principals. Such exaggeration is misplaced, given the plain, unadorned, and unemotional language of SKP's filing.  In esseence, after initiating baseless and unnecessary litigation, Natreon argues that SKP's claims are inflammatory and unsupportable, and seeks to strike straightforward allegations supporting those claims.  Natreon's motion should be denied.

First, Natreon seeks to strike Defendants' affirmative defense of failure to mitigate damages, arguing that such a defense is only available in breach of contract cases.  But Natreon is simply wrong.  It is well-established that "in New Jersey as elsewhere [] tort law requires one wronged by the action of another to mitigate damages." *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).  Because Natreon alleges numerous tort claims here, SKP is entitled to assert this affirmative defense as a matter of law.

Second, Natreon seeks to strike various allegations from SKP's Counterclaim, including allegations regarding (i) the price of Sensoril, (ii) Natreon's attempt to collude with SKP on pricing, (iii) Natreon's history of deceptive conduct, and (iv) Natreon's history of threatening

baseless litigation.  Natreon's history of deceptive and unfair competitive practices are highly relevant to SKP's counterclaims because they demonstrate that Natreon is acting deliberately and willfully.  Natreon cannot meet its burden under Rule 12(f) to show that these allegations "have no possible relation" to this litigation.

Third, Natreon seeks to dismiss SKP's second cause of action under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2.  While this Court has previously held that competitors lack standing to sue under that statute, this court should sustain SKP's standing to sue, as other courts have, because there are compelling reasons to believe that the New Jersey Supreme Court would uphold SKP's standing to sue under the plain language of the statute, and in furtherance of the statute's broad remedial purpose.

## FACTS AND PROCEDURAL HISTORY

### A.     The Parties

SKP manufactures and sells KSM-66, an extract derived from the root of the ashwagandha plant.  Ashwagandha root is an herb used in Ayurvedic medicine, an ancient traditional medical practice that originated in India.  (Counterclaim ¶ 111.)  KSM-66 is extracted solely from the root of the ashwagandha plant using a process free of alcohol or chemical solvents.  (Counterclaim ¶ 112.)

Natreon manufactures its own ashwagandha extract, called Sensoril.  (Counterclaim ¶ 114.)  Unlike KSM-66, Sensoril is derived from a blend of leaves and roots of the ashwagandha plant.  (Counterclaim ¶ 115.)  Third-Party Defendant NutraGenesis LLC ("NutraGenesis") markets Sensoril, and is Natreon's exclusive U.S. distributor.  (Counterclaim ¶ 114.)

**B.      Natreon's and NutraGenesis's False Advertising Claims Regarding Sensoril**

Natreon and NutraGenesis claim that Sensoril is manufactured using a patent-protected method.  Yet their marketing claims are inconsistent with their patents.  (Counterclaim ¶ 98.)

Specifically, Natreon and NutraGenesis claim in their advertising that Sensoril is prepared by a "totally aqueous" extraction process.  (Counterclaim ¶¶ 116, 136.)  At the same time, however, Natreon and NutraGenesis also claim that Sensoril is manufactured using methods protected by U.S. Patent Numbers 6,713,092 B1 and 7,318,938, and Canadian Patent No. 2,508,478 (the "Natreon Patents").  (Counterclaim ¶ 137.)  But the Natreon Patents describe deriving ashwagandha extract using a combination of water and alcohol, and also treating the extract with chemicals such as chloroform.  (Counterclaim ¶ 138.)  These patents do not describe a "totally aqueous" or "pure water-based" extraction process.  (Counterclaim ¶¶ 141-144.)  These directly contradictory advertising claims cannot both be true.  Thus either the claim that Sensoril is extracted according to methods protected by the Natreon Patents is false; or the claim that Sensoril is prepared by a totally aqueous process is false.

Natreon and NutraGenesis also market Sensoril as being covered by European Patent EP 1569669 A2.  (Counterclaim ¶ 99.)  But that patent application was withdrawn in 2012, and no such patent was ever issued.  (*Id.*)

Natreon and NutraGenesis also make a variety of unsupported claims regarding Sensoril's health benefits, including that Sensoril (i) can assist in "effective weight management," (ii) can reduce the activity of a particular liver enzyme in order to boost energy levels, (iii) suppresses food cravings, (iv) speeds workout recovery time, (v) stimulates anabolic muscle development, (vi) increases metabolism, and (vii) promotes the natural synthesis of performance-enhancing hormones.  None of these claims are supported by competent and

reliable scientific evidence as set forth in Federal Trade Commission guidelines.  (Counterclaim ¶ 100.)

Natreon and NutraGenesis charge a substantial premium for Sensoril based on the false claims that the method for manufacturing Sensoril is patented and  that Sensoril confers various health benefits.  (Counterclaim ¶ 103.)  Sensoril has a cost basis of only about $25 per kilogram, while Natreon sells it for about $150 per kilogram, a markup of 500%.  (Counterclaim ¶ 117.)

### C. Natreon Suggests That SKP Engage in Price Collusion with Natreon, and Other Acts of Unfair Competition by Natreon and NutraGenesis

Natreon's and NutraGenesis's false claims regarding Sensoril are part of their long history of engaging in unfair competition.  In 2011, for example, Dr. Sanni Raju, the CEO of Natreon, emailed SKP, threatening litigation, and baselessly alleging that SKP was violating Natreon's patents.  (Counterclaim ¶ 120.)  When SKP asked for more specificity, Natreon provided no further details.  (Counterclaim ¶ 121.)  Natreon never sued on these purported patent claims.

Later, in 2013, Dr. Raju engaged in a series of seemingly friendly emails with SKP Director Kartikeya Baldwa.  (Counterclaim ¶ 122.)  In these emails, Dr. Raju, writing from a personal Yahoo! email account, proposed an in-person meeting, writing that "I have some ideas as to how we can combine our forces and expand the business to make it a big company." (Counterclaim ¶ 122.)

In June 2013, Dr. Raju met with principals of SKP in Hyderabad, India.  (Counterclaim ¶ 123.)  At this meeting, Dr. Raju argued that KSM-66 was priced too low and suggested that SKP increase the price.  (Counterclaim ¶ 123.)  Dr. Raju also proposed various cooperative arrangements between Natreon and SKP, including that SKP take a substantial investment stake in Natreon, and that SKP supply ashwagandha leaves to Natreon.  (Counterclaim ¶ 124.)  SKP

turned down Dr. Raju's anticompetitive proposals.  (Counterclaim ¶ 124.)  Natreon also stated that it would be willing to terminate its decade-long exclusive distribution agreement with NutraGenesis.  (*Id.*)

In November 2013, shortly after SKP rejected Dr. Raju's proposal that SKP collude with Natreon, Natreon sent a cease and desist letter to SKP, falsely claiming that an SKP consultant had made false statements about Sensoril.  (Counterclaim ¶ 127.)  When SKP responded to the letter and noted that the consultant's statements were entirely accurate, Natreon dropped the matter, and its counsel stated that Natreon considered the matter "closed."  (Counterclaim ¶ 128.)

Natreon and NutraGenesis also have a long history of engaging in deception to try to obtain confidential information from SKP.  For example, in December 2010, SKP received an email purportedly from "Melissa Herko" of "Globe Pharma, Inc.," supposedly a potential customer.  In fact this email was sent by Dr. Raju.  (Counterclaim ¶ 131.)  In another example, Dr. Bruce Abedon, an employee of NutraGenesis, came to an SKP booth at a tradeshow.  Dr. Abedon pretended to be a potential customer, and spoke with SKP for approximately 25 minutes in an improper effort to obtain confidential information.  (Counterclaim ¶ 132.)  Similarly, in March 2015, Lucien Hernandez, Natreon's current Senior Vice President of Sales and Marketing and former President, came to an SKP booth at a trade show.  (Counterclaim ¶ 133.)  Mr. Hernandez posed as a potential customer, provided a business card from another company, and tried to obtain confidential information regarding KSM-66.  (Counterclaim ¶ 133.)

### D.    The Current Litigation

Natreon filed suit on August 4, 2016, and later filed two amended complaints that further limited its allegations against Defendants.  (Dkt. #1, 5, 9.)  In the operative Second Amended Complaint ("SAC"), Natreon baselessly alleges that SKP and Ixoreal make false representations

about Sensoril and KSM-66.  Among other things:

- Natreon alleges that Defendants falsely market KSM-66 as an extract, when KSM-66 is merely a "root powder."  In fact, numerous independent bodies have certified that KSM-66 is an extract.

- Natreon alleges that Defendants falsely claim that ashwagandha leaves have high levels of the toxin Withaferin A.  In fact, ashwagandha leaves do have high levels of Withaferin A, as has been documented in numerous academic journals and others reference literature.

- Natreon alleges that Defendants falsely claim that Natreon "adulterates" its extract by using ashwagandha leaves to derive the extract.  In fact, SKP never mentions Natreon in its marketing.  Further, Natreon admits in its Second Amended Complaint that it uses leaves to derive its extract (SAC ¶ 12), and it is well-established in independent treatises that the use of leaves to derive the normal form of the ashwagandha extract is adulteration.

- Natreon alleges that SKP Defendants fail to disclose the presence of milk allergens in KSM-66.  In fact, SKP does disclose the presence of milk allergens to manufacturers who purchase the product.  There are two versions of KSM-66:  a version that is pre-treated with milk, and a vegan version that is dairy-free.  Customers can choose which version they want, and where a customer purchases the version that contains milk allergens, that fact is disclosed to the manufacturers who use KSM-66 in their products.

Defendants answered the Second Amended Complaint on November 7, 2016.  (Dkt. #19.)  In their Answer, Defendants set forth various affirmative defenses, including that Natreon has failed to mitigate damages.  In addition, based on the above-described wrongful conduct by Natreon and NutraGenesis, SKP alleges counterclaims against Natreon and NutraGenesis under the Lanham Act, the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-2, and for common law unfair competition.

In response to SKP's Counterclaim, Natreon filed a motion to (i) strike SKP's affirmative defense of failure to mitigate damages, (ii) strike from the Counterclaim various allegations pertaining to Natreon's wrongful conduct, and (iii) dismiss SKP's claim under N.J. Stat. § 56:8-2 for lack of standing.  The Court should deny Natreon's motion in its entirety.

**ARGUMENT**

**I.      Defendants Properly Plead Failure to Mitigate Damages as an Affirmative Defense**

A motion to strike under Federal Rule of Civil Procedure 12(f) is "highly disfavored." *Eisai Co. v. Teva Pharm. USA, Inc.*, 629 F. Supp. 2d 416, 424 (D.N.J. 2009).  Striking a portion of a pleading is a "drastic" remedy, and therefore motions to strike are "viewed with disfavor." *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002).  When a party asks a court to strike an affirmative defense, the motion may only be granted "if the defense asserted <u>could not possibly</u> prevent recovery under any pleaded or inferable set of facts."  *Tonka Corp. v. Rose Art Industries, Inc.*, 836 F. Supp. 200, 218 (D.N.J. 1993) (internal quotation omitted) (emphasis added).  Natreon argues that the Court should strike Defendants' affirmative defense of failure to mitigate damages because mitigation "applies to breach of contract actions."  (Natreon Br. at 18.)

Natreon is wrong.  It is well-established that "[a]s a matter of common law, New Jersey places on tort victims a duty to mitigate damages by covering."  *Martin Marietta Corp. v. New Jersey Nat. Bank*, 653 F.2d 779, 784–85 (3d Cir. 1981).  Thus "the requirement that plaintiffs mitigate damages prevails <u>as much in the case of damages arising out of tort</u> as it does in the case of breach of contract."  *McGraw v. Johnson*, 42 N.J. Super. 267, 274 (N.J. App. Div. 1956) (emphasis added); *see also Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) ("[I]n New Jersey as elsewhere [] tort law requires one wronged by the action of another to mitigate damages.") (citing *Harvard v. Bushberg Bros., Inc.*, 137 N.J. Super. 537, 542 (N.J. App. Div. 1975)).  Notably, the cases Natreon cites in support of its motion do not apply New Jersey law.[1]

---

[1] *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 300 (3d Cir. 2014) (applying Delaware law); *Resolution Trust Corp. v. Farmer*, 823 F. Supp. 302, 312 (E.D. Pa. 1993) (applying Pennsylvania law); *Weisler v. Safeco Ins. Co. of Illinois*, No. 14 Civ. 81107, 2015 WL 11281290, *3 (S.D. Fla. April 9, 2015) (applying Florida law); *Gomez v. Jacobo Farm Labor Contractor, Inc.*, No. 15 Civ. 1489, 2016 WL 6143342, *11 (E.D. Cal. May 20, 2016) (applying California law).

Here, Natreon has alleged various tort claims under New Jersey law, including claims for unfair competition, trade libel, defamation, and tortious interference with prospective economic relations.  (SAC Counts 2-6.)  New Jersey law requires Natreon to mitigate damages with respect to such tort claims, and Defendants' affirmative defense of failure to mitigate damages is thus entirely proper. [2]

## II.   Natreon Cannot Meet Its Burden Under Rule 12(f) to Show That SKP's Factual Allegations Will Not Have Any Possible Bearing on This Litigation

Natreon's motion to strike SKP's factual allegations is similarly without merit.  A motion to strike factual allegations in a pleading can only be granted when the allegations "have <u>no possible relation</u> to the controversy and may cause prejudice to one of the parties."  *Tonka Corp.*, 836 F. Supp. at 217 (emphasis added).  Thus it is only appropriate to strike pleadings "which will not have <u>any possible bearing</u> on the outcome of the litigation."  *Garlanger*, 223 F. Supp. 2d at 609 (citing *Bristol–Myers Squibb Company v. Ivax Corporation*, 77 F. Supp. 2d 606, 619 (D.N.J. 2000)) (emphasis added).  When a factual allegation "could <u>possibly serve</u> to achieve a better understanding of plaintiff's claims or perform <u>any useful purpose</u> in promoting the just disposition of the litigation, courts generally deny such motions to strike."  *Eisai*, 629 F. Supp. 2d at 425 (quoting *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1292 (D. Del. 1995)) (emphasis added).

---

[2] With respect to Natreon's Lanham Act claim, in the sole case counsel has identified addressing whether the duty to mitigate extends to claims under the Lanham Act, the district court held that the plaintiff had "not established as a matter of law that" the affirmative defense of failure to mitigate damages "is insufficient on its face."  *Fluid Control Prod., Inc. v. Aeromotive, Inc.*, No. 4:09 Civ. 1667, 2010 WL 427765, *4 (E.D. Mo. February 1, 2010).  Further, in *Romag Fasteners, Inc. v. Fossil, Inc.*, the district court declined to reach this question because the defendant did not plead a failure to mitigate defense in its answer.  *See* 29 F. Supp. 3d 85, 103 (D. Conn. 2014).  Because, as argued herein, the failure to mitigate damages is clearly an affirmative defense to Natreon's New Jersey law tort claims, the Court need not now decide whether this defense also applies to Natreon's Lanham Act claim.

Here, Natreon asks this Court to strike portions of 20 paragraphs from SKP's Counterclaim.  As set forth in greater detail below, Natreon cannot meet the high standard for striking factual allegations under Rule 12(f).

### A.      SKP's Statements Regarding Sensoril's Price Are Pertinent

In its Counterclaim, SKP alleges that because Natreon claims that Sensoril is manufactured using a "patent-protected" process, Natreon is able to charge a high premium for Sensoril.  Natreon seeks to strike references to Sensoril's price, referenced in paragraphs 98, 103, and 117-119 of SKP's Counterclaim, arguing that references to Sensoril's price are "inflammatory and immaterial."  (Natreon Br. at 10.)

To the contrary, it is axiomatic that a patent allows a "patent owner to charge a higher-than-competitive price for the patented product."  *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2231 (2013).  Here, SKP alleges that Natreon misleads customers about its product and charges a premium based on its false statements.  The amount of that premium is clearly relevant.  Far from being immaterial, allegations regarding Sensoril's price relate directly to how Natreon has profited through its false statements, and Natreon's motivation to engage in unfair business practices.  Such a core allegation is not "redundant, immaterial, impertinent, or scandalous," Fed. R. Civ. P. 12(f).  Nor can Natreon show that the allegation has "no possible relation to the controversy."  *Tonka Corp.*, 836 F. Supp. at 217.

### B.      Allegations Regarding Natreon's Efforts to Collude with SKP Are Relevant to SKP's Claims of Unfair Competition, Including SKP's Allegation That Natreon Is Acting Willfully

Natreon seeks to strike references to Dr. Raju's attempt to collude with SKP on pricing, referenced in paragraphs 103, 104, and 124 of SKP's Counterclaim.  Natreon argues that these

allegations are irrelevant because SKP "has not alleged an antitrust cause of action." (Natreon Br. at 9.)

SKP's allegations provide important factual background for SKP's claims. SKP alleges "a long history of [Natreon] engaging in unfair competition." (Counterclaim ¶ 119.) With respect to these allegations in particular, in early 2013 Natreon sought to engage in purportedly friendly communications with SKP. (Counterclaim ¶ 122.) Dr. Raju wrote an email from a personal Yahoo! email account suggesting "combin[ing] our forces," and proposed a meeting with SKP's principals in India. (Counterclaim ¶ 122.) At this meeting, Dr. Raju suggested that SKP raise its prices. (Counterclaim ¶ 123.)

These facts are highly relevant to SKP's claims under the Lanham Act and under New Jersey law. Specifically, SKP alleges "a pattern of deceptive and wrongful practices designed to improperly gain a competitive advantage over and cause injury to SKP." (Counterclaim ¶ 125.) SKP further alleges that Natreon's conduct has been "deliberate" and "willful." (*See* Counterclaim ¶¶ 163, 171, 181.) Notably, "[e]xcept in unusual cases, intent can be proven only through circumstantial evidence." *United States v. Jannotti*, 673 F.2d 578, 603 (3d Cir. 1982); *see also United States v. Spillone*, 879 F.2d 514, 520 (9th Cir. 1989) ("Frequently, evidence of intent is circumstantial and less strong than it might be. Under these circumstances, courts permit the introduction of prior crimes."). Because, "contextual and circumstantial evidence [can be] acutely relevant to a defendant's material state of mind . . . such evidence is not only admissible, but may be critical." *United States v. Curtin*, 489 F.3d 935, 952 (9th Cir. 2007).

Thus, in *Rossi v. Standard Roofing*, the Third Circuit noted that evidence that the defendants had previously considered engaging in price-fixing was relevant to demonstrate their intent to engage in an unrelated boycott. 156 F.3d 452, 469-70 (3d Cir. 1998); *see also CFTC v.*

11

*Rosenberg*, 85 F. Supp. 2d 424, 437-38 (D.N.J. 2000) ("[I]t is well-established that similar prior acts may be admitted to show a pattern of operation suggestive of intent where it is in fact an issue at trial."); *In re Khalil*, 578 F.3d 1167, 1168-69 (9th Cir. 2009) ("Fraudulent intent may be inferred from a pattern of behavior"); *United States v. Jewell*, 614 F.3d 911, 922 (8th Cir. 2010) (allowing evidence of a separate tax evasion scheme to show intent to engage in charged tax evasion scheme).

Evidence of Natreon's pattern of wrongful conduct – including, obviously, prior efforts to engage in unfair competition – is thus highly probative of Natreon's intent.  The fact that Natreon previously attempted to collude with SKP on pricing is highly probative of whether Natreon acted deliberately or willfully with respect to the other wrongful conduct alleged in SKP's Counterclaim.  In addition, allegations regarding the prior relationship between Natreon and SKP are also relevant to show the background of the conduct alleged in SKP's Counterclaim.  *United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984) (prior acts admissible to show background of the relationship between the parties).

Further, this Court need not decide at this time whether the evidence of Natreon's conduct is admissible at trial under Federal Rule of Evidence 404(b).  As this Court has previously noted, allegations of prior misconduct should not be stricken from a pleading if such acts, when "read in conjunction with the rest of the Complaint illustrate an alleged 'pattern of wrongful conduct.'"  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. 10 Civ. 453, 2010 WL 5239238, *12 (D.N.J. Dec. 16, 2010).  As noted by this Court in *Church & Dwight*, "[e]vidence of prior bad acts is relevant for purposes of Rule 12(f) even if it is not admissible under Fed. R. Ev. 404."  *Id.* (quoting *Samra v. Johal*, No. 09 Civ. 0171, 2010 WL

12

55856, *1 (W.D. Wash. Jan. 5, 2010)).  Here, the claims regarding Dr. Raju's efforts to suggest collusion with SKP are sufficiently relevant to survive a motion to strike under Rule 12(f).

### C.   Allegations of Deceptive Conduct Proper Under Rule 12(f)

Similarly, SKP's allegations of other deceptive conduct are relevant to establishing Natreon's intent.  Specifically, SKP alleges that Natreon has at various times used deception and other wrongful means to try to obtain confidential information from SKP.  These include (i) Dr. Raju using a fake email address to pretend to be a potential customer, (ii) a NutraGenesis employee pretending to be a potential customer at a trade show, in an attempt to obtain confidential information, and (iii) a senior Vice-President of Natreon pretending to be a potential customer at a trade show, including providing a fake business card, in an effort to obtain confidential information.  (Counterclaim ¶¶ 131-33.)  Such allegations of prior wrongful conduct "may be admitted to show a pattern of operation suggestive of intent where it is in fact an issue at trial."  *Rosenberg*, 85 F. Supp. 2d 437-38.  Moreover, SKP's allegations "relate to the background of the parties' relationship" and therefore "may relate to the controversy" itself.  *Garden State Equities, Inc. v. Ross*, No. 05 Civ. 0085, 2006 WL 1128707, *11 (D.N.J. Mar. 31, 2006).  Finally, even if such allegations were not ultimately admissible under Federal Rule of Evidence 404(b) and/or 403, it would be "premature" to strike the allegations at this time.  *Church & Dwight Co.*, 2010 WL 5239238, at *12.

### D.   The Litigation Privilege Does Not Bar SKP's Statements Regarding Plaintiffs' Pre-Litigation Threats

Natreon seeks to strike from SKP's Counterclaim allegations regarding Natreon's previous threats of baseless litigation, which are found in paragraphs 119-121, 126-29 of SKP's

Counterclaim.  Natreon baldly asserts that Natreon's prior baseless litigation threats against SKP should be stricken because they are subject to a "litigation privilege."[3]  Natreon is wrong.

The litigation privilege "protects a litigant from liability for statements made in the course of judicial, administrative, or legislative proceedings by a litigant or other trial participant."  *Dello Russo v. Nagel*, 358 N.J. Super. 254, 265 (N.J. App. Div. 2003) (dismissing a defamation claim based on alleged statements made in a settlement conference).  The typical context for asserting the privilege is a defamation claim brought based on statements made in relation to litigation.  *See Williams v. Kenney*, 379 N.J. Super. 118, 131 (N.J. App. Div. 2005) (noting that the privilege "provides absolute immunity for defamatory statements" when the statements were made in communications that have "some connection or logical relation to the litigation").  The privilege is not without bounds, but is "limited to situations in which authorities have the power both to discipline persons whose statements exceed the bounds of permissible conduct and to strike such statements from the record."  *Hawkins v. Harris*, 141 N.J. 207, 220 (N.J. 1995).

Here, the litigation privilege is wholly inapplicable.  SKP alleges that Natreon has engaged in a pattern of bad faith behavior, including threats of baseless litigation.  This Court has noted that the threat of bad faith litigation can support a claim for unfair competition.  *See Avaya, Inc. v. Cisco Sys.*, No. 10 Civ. 5881, 2012 WL 2065536, *9-10 (D.N.J. June 7, 2012) (but dismissing unfair competition claim because the counterclaimant had not alleged that the litigation was brought in bad faith).  Other courts have similarly noted that "[t]hreats of baseless litigation can constitute improper anticompetitive conduct for purposes of the antitrust laws."

---

[3] Natreon also bizarrely suggests that SKP's reference to this litigation should be stricken from SKP's Counterclaim. It is hard to imagine how the fact of the instant litigation is impertinent to this litigation.  And it is hard to imagine how Natreon will keep the fact of this litigation from coming up in this litigation.

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 770 (D.N.J. 1999); *see also CareFusion Corp. v. Medtronic Spine LLC*, No. 10 Civ., 01111, 2010 WL 4509821, *5 (N.D. Cal. Nov. 1, 2010) (noting that baseless litigation could support an antitrust claim). Further, courts have long held that litigation conduct could provide important background information in support of a claim. For example, in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, the Ninth Circuit held that conduct in a prior litigation was relevant to a later RICO claim. 431 F.3d 353 (9th Cir. 2005).

Moreover, prior threats of litigation provide background information that serves to "achieve a better understanding of" the claims in this case and to "promot[e] the just disposition of the litigation." *Delaware Health Care v. MCD Holding Co.*, 893 F. Supp. 1279, 1292 (D. Del. 1995); *Garden State Equities*, 2006 WL 1128707, *11. (allegations "relating to the background of the parties' relationship" are relevant). Here, Natreon's prior threats provide background information and context relevant to this litigation. Natreon cannot show that these facts "have no possible relation to the controversy." *Tonka Corp.*, 836 F. Supp. at 217. Accordingly, the Court should deny Natreon's motion to strike.

## III.   SKP Has Standing to Bring a Claim Under the CFA

Natreon argues that SKP lacks standing to assert a claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2 ("CFA"). "[T]here is a split in this District as to whether a competitor has standing to assert a claim under the New Jersey Consumer Fraud Act." *Interlink Prod. Int'l, Inc. v. F & W Trading LLC*, No. 15 Civ. 1340, 2016 WL 1260713, *9 (D.N.J. Mar. 31, 2016).[4]  While this Court has previously held that competitors lack standing to bring a claim

---

[4] As noted by Natreon, at least two judges within the District of New Jersey have noted that the CFA provides standing to competitors. *See Gen. Dev. Corp. v. Binstein*, 743 F. Supp. 1115, 1131 (D.N.J. 1990); *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295-96 (D.N.J. 2006).

under the CFA, *see Church & Dwight Co.*, 2010 WL 5239238, at *12, SKP respectfully submits, this Court should hold, as other courts have, that competitors have standing to bring claims under that statute.

First, in determining whether the CFA provides standing to competitors, "[u]ltimately, the role of the district court is to forecast how the state supreme court would rule on the issue." *L.M. ex rel. H.M. v. Evesham Twp. Bd. of Educ.*, 256 F. Supp. 2d 290, 298 (D.N.J. 2003) (Wolfson, J.). With respect to the CFA, the New Jersey Supreme Court has held that the provisions of the statute should be "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 264 (1997). Further, the New Jersey Supreme Court has held that to state a claim under the CFA, a plaintiff need only allege "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). That is all. The New Jersey Supreme Court has never required that the plaintiff have purchased anything from the defendant.

Second, as this Court has previously observed, "the New Jersey Supreme Court looks first to a statute's plain language to ascertain its meaning," and that language "is to be given its ordinary meaning." *L.M.*, 256 F. Supp. 2d at 298 (citing *Kimmelman v. Henkels & McCoy, Inc.*, 108 N.J. 123, 128 (N.J. 1987)); *Merin v. Maglaki*, 126 N.J. 430, 434-35 (N.J. 1992). Indeed, the New Jersey Supreme Court has repeatedly held that, while it seeks to divine legislative intent, "the best indicator of that intent is the statutory language." *Frugis v. Bracigliano*, 177 N.J. 250, 280 (N.J. 2003).

Here, the plain language of the CFA makes clear that it confers standing on all injured parties, not merely consumers. The CFA provides a private right of action to "[a]ny person who

16

suffers any ascertainable loss of moneys or property" as a result of conduct prohibited by the Act.  N.J. Stat. Ann. § 56:8-19 (emphasis added).  "Person" includes "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association" and is not limited to "consumers."  *See* N.J. Stat. Ann. § 56:8-1(d).

Indeed, the New Jersey Supreme Court has relied on the broad definition of "person" set forth in the CFA to hold that the Act has a particularly expansive reach.  In *Allen v. V & A Bros.*, the New Jersey Supreme Court considered whether an individual employee of a corporation could be personally liable under the CFA for making false statements.  208 N.J. 114, 136 (2011).  Noting "the broad remedial purposes of the CFA and the <u>expansive sweep</u> of the definition of 'person' " in Section 56:8-1, the New Jersey Supreme Court held that an individual corporate employee can be liable under the CFA.  *Id.* at 131, 136; *cf. Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 91 (2006) (holding that a school is a "person" under the passive abuse provision of the New Jersey Child Sex Abuse Act); *Velez v. City of Jersey City*, 180 N.J. 284, 293 (2004) (adopting a broad definition of "injury" because "[t]his statutory definition is expansive and unqualified." (internal quotation omitted)).

<u>Third</u>, the CFA elsewhere uses more restrictive language when it limits its provisions to consumers or consumer products.  For example, in the subsection involving price disclosures, "Consumer Commodity" is defined as a commodity "distributed or offered for retail sale for consumption by individuals other than at the retail establishment, or for use by individuals for purposes of personal care or in the performance of services rendered within the household, and which is consumed or expended in the course of such use."  N.J. Stat. Ann. § 56:8-22.  In the portion of the CFA dealing with motor vehicle sales, "Consumer" is defined as "the purchaser or prospective purchaser, other than for the purpose of resale, of a used motor vehicle normally

17

used for personal, family or household purposes."  N.J. Stat. Ann. § 56:8-67.  In other words, when the New Jersey legislature meant "consumer," it used and defined the term.  But when stating who may bring a private right of action for damages related to consumer fraud, the legislature stated that an action may be brought by any "person," not merely "consumers."

Fourth, the language of the CFA is similar to other state consumer protection statutes that grant standing to sue to competitors.  For example, like the CFA, New York General Business Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice."  (emphasis added).  The New York Court of Appeals has recognized that, in reliance on this clear language, "standing under General Business Law § 349(h) had been extended to consumers and competitors."  *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (N.Y. 2009). In contrast, the Pennsylvania consumer protection statute specifically limits standing to consumers.  *See* 73 Pa. Stat. § 201-9.2 (limiting standing to persons "who purchase[] or lease[] goods or services primarily for personal, family or household purposes").  The language of the New Jersey statute contains no such limitation on its private right of action.

Fifth, while New Jersey state courts have found that there are limits to the application of the CFA based on the fact that it was enacted to protect consumers, these limits govern the types of *transactions* that the statute is subject to, not the types of plaintiffs.  *See Arc Networks, Inc. v. Gold Phone Card Co.*, 333 N.J. Super. 587, 590 (Monmouth Cty. 2000) (noting that "consumer transactions" are defined by the "nature of the transaction itself").  In *Arc Networks*, for example, the court held that the sale of bulk telephone services was not a "consumer transaction" because the services "were not available to the general public."  333 N.J. Super. at 589-91.  Here, Natreon, through NutraGenesis, sells Sensoril which is incorporated into products sold to

18

consumers.  *See* N.J. Stat. Ann. § 56:8-1(c) (defining "merchandise" to include goods sold "directly or indirectly").  Without question, the "nature of the transaction" here – the sale of ingredients to be incorporated into consumer products – is the type of transaction that the CFA was designed to regulate.

Accordingly, consistent with the "broad remedial purpose" and the plain text of the CFA, this Court should rule that SKP has standing to bring its claims under the CFA.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that Plaintiff's motion to strike and dismiss be denied in its entirety.

Respectfully submitted,

Dated: New York, New York
January 17, 2017

MANATT, PHELPS & PHILLIPS, LLP

By: *s/Kenneth D. Friedman*
Kenneth D. Friedman
Arunabha Bhoumik (*pro hac vice*)
7 Times Square, 23rd Floor
New York, NY  10036
(212) 790-4500

*Attorneys for Shri Kartikeya Pharma and Ixoreal Biomed Inc.*

19