**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————————
                             :

NATREON, INC.,                  :

                         :

       Plaintiff,           :

                         :       Civ. Action No.: 16-4735 (FLW) (DEA)

v.                      :

                         :            **OPINION**

IXOREAL BIOMED, INC., and SHRI  :

KARTIKEYA PHARMA, LTD.,    :

                         :

       Defendants.      :

—————————————————————————:

                         :

SHRI KARTIKEYA PHARMA, LTD.,  :

                         :

       Counterclaimant,  :

                         :

v.                      :

                         :

NATREON, INC.,               :

                         :

       Counterclaimant Defendant.  :

—————————————————————————:

                         :

SHRI KARTIKEYA PHARMA, LTD.,  :

                         :

       Third-Party Plaintiff,  :

                         :

v.                      :

                         :

NUTRAGENESIS, LLC,        :

                         :

       Third-Party Defendant.  :

—————————————————————————:

**WOLFSON, United States District Judge:**

       In this case, plaintiff and counterclaimant-defendant Natreon, Inc. ("Natreon") brought

suit against defendant, counterclaimant and third-party plaintiff Shri Kartikeya Pharma, Ltd.

("SKP") and defendant Ixoreal Biomed Inc. ("Ixoreal"), alleging that those defendants engaged in false advertising and unfair competition in connection with the manufacturing and sale of their product – an extract used in holistic and alternative medicines.  In response, SKP filed three Counterclaims, alleging that Natreon also engaged in false advertising and unfair competition in the manufacturing and sale of Natreon's similar extract product.  In addition, SKP filed a Third-Party Complaint against third-party defendant NutraGenesis, LLC ("NutraGenesis").  Ixoreal is neither a party to the Counterclaims nor the Third-Party Complaint.  Presently before the Court is Natreon's partial motion to dismiss SKP's Counterclaim for violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2, pursuant to Fed. R. Civ. P. 12(b)(6), and a separate motion by Natreon: (i) to strike the Eighth affirmative defense of failure to mitigate, and (ii) to strike allegations from the pleadings of SKP and Ixoreal that Natreon claims are inflammatory, confusing and collateral, pursuant to Fed. R. Civ. P. 12(f).  NutraGenesis has joined in the motion to strike allegations.  For the reasons set forth below, Natreon's partial motion to dismiss the Counterclaim that pleads violations of the NJCFA is **GRANTED**;[1] and, Natreon's motion to strike is **GRANTED** in part and **DENIED** in part as follows: (i) the motion to strike the Eighth Affirmative defense for failure to mitigate damages is **GRANTED**, but (ii) the motion, joined by Nutragenesis, to strike certain allegations as inflammatory, confusing and collateral is **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### a.    Factual Background

---

[1] As discussed infra, Natreon does not move to dismiss SKP's additional Counterclaims for violation of § 43(a) of the Lanham Act ("Lanham Act"), 15 U.S.C. § 1125(a), and common law unfair competition.

[2] The following factual allegations from the Counterclaims are taken as true.

SKP manufactures and sells the product, KSM-66, an extract derived from the root of the ashwagandha plant.  Countercl., ¶ 111.  According to SKP, "[a]shwagandha root is an herb used in Ayurvedic medicine, an ancient traditional medical practice that originated in India."  Id.  SKP alleges that KSM-66 "is produced using a first-of-its-kind extraction process without using alcohol or any other chemical solvents."  Id. at ¶ 112.

Natreon manufactures and sells Sensoril, its own ashwagandha extract, id. at ¶ 114,  SKP "derived from a blend of leaves and roots of the ashwagandha plant."  Id. at ¶ 115.  NutraGenesis markets Sensoril in the United States, and "is the exclusive distributor for Sensoril on behalf of Natreon…."  Id. at ¶ 114.  SKP alleges that, over the past several years, the "sales of Sensoril have been growing at a healthy pace."  Id. at ¶ 118.

SKP generally asserts that Natreon and NutraGenesis have made false and misleading claims in marketing and advertising materials about Sensoril.  Id. at ¶ 134.  SKP claims that Sensoril is manufactured using a patent-protected method, but the marketing representation of Natreon and NutraGenesis are inconsistent with the terms of their patents.[3]  Id. at ¶ 98.  In particular, SKP alleges that Natreon and NutraGenesis claim that Sensoril is prepared using a "totally aqueous" extraction process "without the use of any chemical solvents."  Id. at ¶¶ 116, 136.  However, SKP avers that that Natreon's patents describe deriving ashwagandha extract using a combination of water and alcohol, as well as treating the extract with chemicals such as chloroform.  Id. at ¶¶ 138, 141.  SKP alleges that, based on the language of the patents, Natreon cannot claim that it employs a completely water-based extraction process.  Id. at ¶ 138.

_____

[3] According to SKP, "Natreon and NutraGenesis market Sensoril as having been manufactured using methods protected by U.S. Patent Nos. 6,713,092B1 and 7,318,938, and Canadian Patent No. 2,508,478."  Id. at ¶ 137.  In addition, SKP asserts that Natreon and NutraGenesis also market Sensoril as being covered by European Patent EP 1569660 A2, but that "application was withdrawn in 2012 and [that] Patent was never issued."  Id. at ¶ 99.

SKP also alleges that Natreon and NutraGenesis have made certain unsubstantiated claims about the health benefits of Sensoril, including that it: (i) assists with weight management; (ii) boosts energy levels; (iii) reduces food cravings; (iv) increases workout recovery times; (v) increases anabolic muscle development; (vi) stimulates the metabolism; and (vii) helps the body produce performance enhancing hormones.  Id. at ¶ 100.  Indeed, SKP alleges that "[n]one of these claims are supported by competent and reliable human clinical studies using Sensoril," and as a result, Natreon has failed to meet the standards set forth by the Federal Trade Commission.  Id.

Furthermore, SKP alleges that "Natreon and NutraGenesis falsely represent that Natreon is the only company with the right to make an extract from ashwagandha root and leaves," and that "Natreon's patents do not give [Natreon the] exclusive right to make an extract from [both the] roots and leaves, and many of Natreon's competitors make such extracts."  Id. at ¶ 101.  In addition, SKP asserts that "Natreon and NutraGenesis also falsely claim that ashwagandha leaves are naturally richer in glycowithanolide bioactive content causing Sensoril to have a 'superior bioactive content' and thus a 'lower recommended efficacious dose and per dose cost-of-goods than many other branded root-only ashwagandha extracts."  Id. at ¶ 102.

In its Counterclaims, SKP additionally alleges that Natreon has attempted to recruit SKP into engaging in price collusion.  Id. at ¶¶ 103-05.  SKP asserts that "Natreon and NutraGenesis charge a substantial premium for Sensoril."  Id. at ¶ 103.  Specifically, SKP alleges that Natreon's ashwagandha extract "has a cost basis of approximately $25 per kilogram, yet Natreon sells Sensoril for approximately $150 per kilogram, or a 500% mark-up."  Id. at ¶ 117.  SKP asserts that, since Natreon's product is not competitively priced, Dr. Sanni Raju ("Raju"), the chief executive officer of Natreon, "attempted to collude with SKP over several months in

2013," and that Raju stated in an February 2013 email that "[he] [has] some ideas as to how [Natreon and SKP] can combine [their] forces and expand the business to make it a big company." Id. at ¶ 103. In addition, SKP alleges that, in June 2013, Raju attended a meeting with principals from SKP, and that Raju suggested that SKP raise the price of KSM-66 "so as to increase its profitability." Id. at ¶¶ 103, 123.

Relatedly, SKP alleges that Natreon engaged in unfair competition by threatening meritless litigation on several occasions. Id. at ¶¶ 125-30. In particular, in February 2011, Raju sent an email to a SKP representative "and falsely alleged that SKP was infringing on Natreon's patents," but, "[w]hen [the representative] asked for some explanation as to how SKP was infringing on Natreon's patent, [Raju] declined to provide any details." Id. at ¶ 126. Additionally, SKP asserts that, in November 2013, "an attorney claiming to represent Natreon wrote a cease and desist letter [addressed to two SKP representatives] claiming that [another SKP representative] made false and misleading statements regarding Sensoril in an effort to damage Sensoril's reputation." Id. at ¶ 127. SKP alleges that, when it responded to that letter, "Natreon, through [its] counsel, responded that it did indeed have evidence of SKP's purportedly wrongful conduct but that it would not share its evidence with SKP." Id. at ¶ 128. According to SKP, "Natreon's counsel simply stated that it considered the matter 'closed.'" Id.

Finally, SKP alleges that both Natreon and NutraGenesis have engaged in deceptive acts in an attempt to obtain confidential information. Id. at ¶ 131-33. For instance, in December 2010, SKP received an email from "Melissa Herko," who stated that she worked for "GlobePharma, Inc.," and that "GlobePharma, Inc. was 'trying to find good sources' for [] certain products including ashwagandha." Id. at ¶ 131. However, SKP claims that "this email was sent by [Raju], disguising himself as Ms. Herko." Id. In addition, SKP alleges that, in

November 2012, Dr. Bruce Abedon ("Abedon"), an employee of NutraGenesis, visited the SKP booth at a tradeshow.  Id. at ¶ 132.  Allegedly, Abedon "claimed that he was a prospective customer interested in purchasing KSM-66 for use in a supplement," and that "Abedon spent approximately 25 minutes talking to SKP… [to] collect[] confidential information regarding KSM-66…."  Id.  In another example, SKP claims that, during a tradeshow in March 2015, Lucien Hernandez ("Hernandez"), a Senior Vice President of Sales at Natreon, posed as a potential customer, and provided a business card from another company, in an attempt to obtain confidential information about KSM-66.  Id. at ¶ 133.

**b.    Procedural History**

On August 4, 2016, Natreon filed its original complaint against Defendants. Approximately one month later, on September 8, 2016, Natreon filed its amended complaint. Later that month, on September 30, 2016, Natreon filed its Second Amended Complaint against Defendants, asserting the following claims: Count One – false advertising and unfair competition under § 43(a) of the Lanham Act; Count Two – unfair competition under N.J.S.A. § 56:4-1; Count Three – common law unfair competition; Count Four – common law tortious interference with prospective economic relations; Count Five – common law defamation, specifically libel; and Count Six – common law trade libel.[4]

---

[4] In its Second Amended Complaint, Natreon alleges that SKP and Ixoreal made false representations to the public about "their KSM-66 product featuring the herb [called] ashwagandha," specifically that it does not contain milk allergens.  Sec. Am. Compl., ¶ 1.  In its moving papers, Natreon explains that its "complaint not only assert[s] serious allegations against Defendants, it also indicate[s] voluminous evidence supporting its claim, including independent studies verifying that Defendants' product, KSM-66, contains milk allergens, a fact Defendants fail to state on their product labels, their website and/or in their Department of Quality Control Certificate of Analysis, resulting in some distributors labeling their products containing KSM-66 as 'dairy free,' when it is not."  Natreon's Br. at p. 1.

On November 7, 2016, SKP and Ixoreal filed their Answer to the Second Amended Complaint.  In addition, SKP individually filed three Counterclaims against Natreon, as well as a Third-Party Complaint against NutraGenesis.  Relevant here, in its Answer, SKP and Ixoreal assert nine affirmative defenses, including the Eighth affirmative defense of failure to mitigate damages.  In its Counterclaims against Natreon, SKP asserts the following causes of action: (i) Count One – false advertising and unfair competition under § 43(a) of the Lanham Act; Count Two – violation of the NJCFA; and Count Three – common law unfair competition.

On December 12, 2016, Natreon filed a partial motion to dismiss the Counterclaim for violation of the NJCFA, pursuant to Fed. R. Civ. P. 12(b)(6), and a motion to strike various allegations and the Eighth affirmative defense under Fed. R. Civ. P. 12(f).  SKP filed opposition to this omnibus motion.  Additionally, on January 20, 2017, NutraGenesis filed a separate motion to dismiss the Third-Party Complaint, and it also joined Natreon's motion to strike certain allegations.  On February 7, 2017, SKP and Ixoreal filed an Amended Answer to the Second Amended Complaint, and SKP also filed Amended Counterclaims.  On February 14, 2017, Natreon filed a reply memorandum in support of its motion.

While SKP and Ixoreal filed amended pleadings, on February 23, 2017, the Magistrate Judge entered a stipulation order agreed to by the parties, which included, inter alia, the following terms and conditions: (i) SKP and Ixoreal withdraw their Amended Answer and Counterclaims without prejudice; and (ii) "[SKP's] time to respond to NutraGenesis LLC's Motion to Dismiss the Third-Party Complaint [] shall be extended until fourteen (14) days following the date this Court enters an order deciding [Natreon's] Motion."  See Dkt. No. 50, Stipulation Order, dated February 23, 2017.  Accordingly, since NutraGenesis' motion to dismiss

is effectively stayed pending this Opinion, the only motion before the Court is Natreon's motion

to dismiss and to strike.[5]

## II.    STANDARD OF REVIEW

### a.    Rule 12(b)(6)

When reviewing a motion to dismiss on the pleadings, courts "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation

marks omitted).  Under such a standard, the factual allegations set forth in a complaint "must be

enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to

relief.  A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC

Shadyside, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing

that the pleader is entitled to relief" in order to "give the defendant fair notice of what the…

claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555.  The complaint must

include "enough factual matter (taken as true) to suggest the required element.  This does not

impose a probability requirement at the pleading stage, but instead simply calls for enough facts

to raise a reasonable expectation that discovery will reveal evidence of the necessary element."

Phillips, 515 F.3d at 234 (internal quotation marks and citation omitted); Covington v. Int'l

---

[5] The Court will administratively terminate NutraGenesis' motion to dismiss.

Ass'n of Approved Basketball Officials, 710 F.3d 114, 118 (3d Cir. 2013) (internal quotation marks and citation omitted) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief.").

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations marks and brackets omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. (internal quotation marks omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. (internal quotation marks and brackets omitted).

**b.    Rule 12(f)**

Under Rule 12(f), courts are permitted to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); see Geruschat v. Ernst Young LLP, 505 F.3d 237, 248 n.9 (3d Cir. 2007). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." Garlanger v. Verbeke, 223 F. Supp. 2d 596, 609 (D.N.J. 2002). Generally, "motions to strike under Rule 12(f) are highly disfavored." FTC v. Hope Now Modifications, LLC, No. 09-1204, 2011 U.S. Dist. LEXIS 24657, at *4 (D.N.J. Mar. 10, 2011); see Garlanger, 223 F. Supp. 2d at 609; see also GI Sportz, Inc. v. Valken, Inc., No. 16-7170, 2017 U.S. Dist. LEXIS 91991, at *4 (D.N.J. June 15, 2017). In addition, "[t]he district

court's decision whether to grant a motion to strike under Rule 12(f) is discretionary." <u>Hope Now Modifications</u>, 2011 U.S. Dist. LEXIS 24657, at *5.

Courts have explained that motions to strike the pleadings "will generally be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." <u>Garlanger</u>, 223 F. Supp. 2d at 609 (internal quotation marks and citation omitted). Indeed, "even where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." <u>Hope Now Modifications</u>, 2011 U.S. Dist. LEXIS 24657, at *4-5 (internal quotation marks and citation omitted). In other words, "[t]he successful motion to strike is granted to 'save time and expense' by clearing away pleadings 'which will not have any possible bearing on the outcome of the litigation.'" <u>Id.</u> at *4 (quoting <u>Garlanger</u>, 223 F. Supp. 2d at 609).

In the same vein, courts are reluctant to strike affirmative defenses from the pleadings "unless the insufficiency of the defense is clearly apparent." <u>Cipollone v. Liggett Group, Inc.</u>, 789 F.2d 181, 188 (3d Cir. 1986); <u>see</u> <u>United State v. Kramer</u>, 757 F. Supp. 397, 410 (D.N.J. 1991) (internal quotation marks and citation omitted) (stating that "motions to strike serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case."). "An affirmative defense is insufficient if it is not recognized as a defense to the cause of action." <u>Hope Now Modifications</u>, 2011 U.S. Dist. LEXIS 24657, at *5 (internal quotation marks and citation omitted). Therefore, "on the basis of the pleadings alone, an affirmative defense can be stricken only if the defense asserted could not possibly prevent recovery under any pleaded or

10

inferable set of facts." Id. (internal quotation marks and citation omitted); see GI Sportz, Inc., 2017 U.S. Dist. LEXIS 91991, at *4.

## III.    DISCUSSION

On this motion, Natreon asserts three separate arguments: (i) SKP does not have standing to assert its Counterclaim under the NJCFA; (ii) the Court should strike the Eighth affirmative defense of failure to mitigate from the Answer; and (iii) the Court should strike various inflammatory and confusing allegations from the Counterclaims.  NutraGenesis only joins in Natreon's motion to strike allegations that are inflammatory, confusing and collateral.

### a.    Motion to Dismiss Counterclaim for Violation of the NJCFA

Natreon argues that SKP lacks standing to assert a NJCFA claim.  Specifically, Natreon contends that SKP does not allege that it has suffered a consumer-like injury, and instead, it is a competitor who alleges harm based upon unfair competition and false advertising.  In response, SKP concedes that this Court has held that a competitor lacks standing to assert a claim under the NJCFA unless the competitor alleges a consumer-like injury.[6]  Nonetheless, SKP argues that I should reverse my prior decision, since "the plain language of the [NJCFA] makes clear that it confers standing on all injured parties, not merely consumers."  SKP's Br. in Opp. at p. 16. However, I decline to adopt SKP's position.

Under the NJCFA, a plaintiff must establish three elements: (i) unlawful practice by the defendant, (ii) ascertainable loss, and (iii) a causal relationship between the unlawful conduct

---

[6] SPK is referencing my decision in Church & Dwight Co. v. SPD Swiss Precision Diagnostics, No. 10-453, 2010 U.S. Dist. LEXIS 133114, at *24-31 (D.N.J. Dec. 16, 2010) (holding that "the NJCFA is not intended to protect competitors such as Plaintiff that do not suffer a consumer-like injury.").

and the ascertainable loss. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009). The term "unlawful practice" is defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby….

N.J.S.A. § 56:8-2. The NJCFA "seeks to protect consumers who purchase goods or services generally sold to the public at large." Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494, 514 (3d Cir. 2006) (internal quotation marks and citation omitted); see Marascio v. Campanella, 298 N.J. Super. 491, 501 (App. Div. 1997) (the NJCFA's "focus is to compel those who sell consumer goods and services to the public to develop practices that will minimize consumer fraud."); see also Interlink Prods. Int'l, Inc. v. F&W Trading, LLC, No. 15-1340, 2016 U.S. Dist. LEXIS 44256, at *27 (D.N.J. Mar. 31, 2016) (internal quotation marks and citation omitted) (the NJCFA "provides relief to consumers from fraudulent practices in the market place.").

Despite its laudable goals, the Third Circuit explained that "the [NJCFA] is not intended to cover every transaction that occurs in the marketplace, but, rather, its applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." Cetel, 460 F.3d at 514 (internal quotation marks, brackets and citation omitted). While neither "the statute nor the New Jersey Supreme Court has explained with any precision who constitutes a consumer," Interlink Prods. Int'l, Inc. v. Cathy Trading, LLC, No. 16-2153, 2017 U.S. Dist. LEXIS 33548, at *5 (D.N.J. Mar. 9, 2017), the Third Circuit has advised that "the entire thrust of the [statute] is pointed to products and services sold to consumers in the popular sense." Cetel, 460 F.3d at 514; see Finderne Management Co., Inc. v. Barrett, 402 N.J. Super. 546, 570 (App. Div. 2008) ("To qualify as a consumer transaction… the

12

challenged [goods or] services generally must be of the type sold to the general public.").  In

light of that guidance, when determining whether a commercial transaction falls within the

NJCFA, courts focus on the nature of the transaction between the parties.[7]  See Papergraphics

Int'l, Inc. v. Correa, 389 N.J. Super. 8, 13 (App. Div. 2006) (the NJCFA "does not cover every

sale in the marketplace," but rather, "[NJCFA] applicability hinges on the nature of a transaction,

requiring a case by case analysis."); see also Elec. Mobility Corp. v. Bourns Sensors/Controls,

Inc., 87 F. Supp. 2d 394, 400 (D.N.J. 2000) (internal quotation marks and citation omitted)

("courts have held that it is the character of the transaction rather than the identity of the

purchaser which determines if the [NJCFA] is applicable.").

        In the context of business entities, the NJCFA has only been applied to entities "who

purchase goods and services for use in their business operations."  Prescription Counter v.

AmerisourceBergan Corp., No. 04-5802, 2007 U.S. Dist. LEXIS 84102, at *44 (D.N.J. Nov. 14,

2007); see Coastal Group, Inc. v. Dryvit Systems, Inc., 274 N.J. Super. 171, 179 (App. Div.

1994) (stating that "the protections of the [NJCFA] extend to the purchase of merchandise for

use in business operations").  New Jersey courts have explained that the NJCFA applies "to

corporate plaintiffs in consumer oriented situations."  Papergraphics Int'l, Inc., 389 N.J. Super. at

12; see Finderne Management Co., Inc. v. Barrett, 402 N.J. Super. 546, 569 (App. Div. 2008);

see also Cathy Trading, LLC, 2017 U.S. Dist. LEXIS 33548, at *6 (stating that a business entity

must allege that it suffered "consumer-like injuries."); F&W Trading, LLC, 2016 U.S. Dist.

---

[7] Indeed, SKP concedes that this Court should examine the nature of the transaction.  See SKP's Br. in Opp. at p. 18 (emphasis in original) (stating that, "while New Jersey state courts have found that there are limits to the application of the CFA based on the fact that it was enacted to protect consumers, these limits govern the types of *transactions* that the statute is subject to, not the types of plaintiffs.").

LEXIS 44256, at *28 (same).  Indeed, I have previously stated that "[a]n example of a consumer relationship amongst business entities is when products and services are purchased for consumption or use in the course of business."  Church & Dwight Co., 2010 U.S. Dist. LEXIS 133114, at *26 (internal quotation marks omitted); see Cathy Trading, LLC, 2017 U.S. Dist. LEXIS 33548, at *6 (explaining that the plaintiff did not suffer a consumer-like injury because "[t]hey do not directly purchase their competitor's goods for bona fide use.").

In the instant matter, it is abundantly clear that the nature of the alleged wrongdoing does not fall within the purview of the NJCFA.[8]  Indeed, SKP and Natreon are business competitors, specifically in the manufacturing of ashwagandha extract for use in Ayurvedic products.  In its Counterclaims, SKP asserts that Natreon has made misrepresentations in its advertising and marketing about the nature, characteristics and qualities of its ashwagandha extract.  Notably absent from its Counterclaim, however, is the allegation that SKP engaged in some type of consumer-oriented transaction with Natreon, or that SKP purchased goods or services from Natreon for use in its business operations.  In other words, SKP has not alleged a "consumer-like injury."  See Sanofi-Aventis United States, LLC v. Novo Nordisk, Inc., No. 16-9466, 2017 U.S. Dist. LEXIS 106008, at *2 (D.N.J. July 10, 2017) (dismissing NJCFA claim because the "[p]laintiff is a competitor, and does not allege a consumer-like injury."); Cathy Trading, LLC, 2017 U.S. Dist. LEXIS 33548, at *6 (same); F&W Trading, LLC, 2016 U.S. Dist. LEXIS 44256, at *28) (same).  Because SKP lacks standing, the Counterclaim under the NJCFA is dismissed.

**b.    Motion to Strike Eighth Affirmative Defense**

---

[8] Tellingly, SKP has failed to cite any cases that have permitted a business entity to assert a NJCFA claim on the basis that the alleged wrongdoer engaged in unfair competition or false advertising.

Natreon argues that the Eighth affirmative defense for failure to mitigate damages should be stricken because it has no possible relation to the issues in the Complaint, and that it is objectively improper, since "Natreon is not under any such duty to mitigate for [the] purposes of the causes of action it asserted against Defendants." See Natreon's Br. at p. 13. Specifically, Natreon contends that the duty to mitigate only applies to breach of contract defenses. In response, SKP argues that the duty to mitigate also applies to tort actions, and that "Natreon has alleged various tort claims under New Jersey law, including claims for unfair competition, trade libel, defamation, and tortious interference with prospective economic relations." As a result, SKP contends that the Eighth affirmative defense should not be stricken from the Answer.

Under New Jersey law, the failure to mitigate is considered an affirmative defense. See C.A.M. v. R.A.W., 237 N.J. Super. 532, 543 n.9 (App. Div. 1990) ("Mitigation of damages has been referred to as an affirmative defense."). An injured party must take reasonable steps to mitigate its damages, or else "[d]amages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts without undue risk, burden or humiliation." Sean Wood, LLC. v. Hegarty Group, Inc., 422 N.J. Super. 500, 519 (App. Div. 2011) (internal quotation marks and citation omitted). Typically, the failure to mitigate defense is available in breach of contract actions. See Sommer v. Kridel, 74 N.J. 446, 454 n.3 (1977) (stating that "a party claiming damages for a breach of contract has a duty to mitigate his loss."). However, as SKP correctly points out, the failure to mitigate defense is also available in certain tort actions. See State v. Weiswasser, 149 N.J. 320, 329 (1997) ("The duty to mitigate damages is most traditionally employed in the areas of tort and contract law."); see also McGraw v. Johnson, 42 N.J. Super. 267, 274 (App. Div. 1956).

While tort and contract laws require an injured party to mitigate its damages in some instances, courts must still determine whether the duty to mitigate is a recognized defense as to each of the claims in a complaint.  See Newborn Bros. Co. v. Albion Engineering Co., No. 12-2999, 2014 U.S. Dist. LEXIS 41148, at *24 (D.N.J. Mar. 27, 2014); see also Hope Now Modifications, 2011 U.S. Dist. LEXIS 24657, at *5.  In its opposition, SKP does not even argue that failure to mitigate damages is a recognized defense to a Lanham Act claim, nor does it cite any legal authority for the proposition that failure to mitigate is a recognized defense to the common law claims in the Second Amended Complaint.  Moreover, this Court is unable to find any controlling authority to support the position that mitigation of damages is a valid affirmative defense to the Lanham Act, unfair competition, trade libel, defamation, or tortious interference with prospective economic relations causes of action.  I do not find that such a defense is applicable to the Counterclaims asserted in this case.  See Janes v. Watson, No. 05-473, 2006 U.S. Dist. LEXIS 59004, at *52-53 (W.D. Tex. Aug. 2, 2006) (questioning "how the failure to mitigate defense applies [to claims for]… unfair competition, trademark infringement, trademark dilution, injury to business reputation… tortious interference with existing and prospective business relationships, and misappropriation of trade secrets," since "there is nothing Plaintiffs can do to mitigate [their] damages").  Thus, the Eighth affirmative defense is stricken.  See Cipollone, 789 F.2d at 188; see Hope Now Modifications, 2011 U.S. Dist. LEXIS 24657, at *5.

**c.      Motion to Strike Inflammatory, Confusing and Collateral Allegations**

Next, Natreon argues that "[t]rimming the Counterclaim here is necessary because SKP is using this Counterclaim to retaliate against Natreon for filing this lawsuit and as a smear campaign against the plaintiff company and its principals."  Natreon's Br. at p. 7.  Natreon

further argues that "[m]ultiple allegations have no relation to the Counterclaim at all, and quite frankly, reflect cruelly upon the moral character of principals at the plaintiff company."  Id.

### i.    References to the Filing of a Lawsuit and Cease and Desist Letter

Natreon argues that, under the New Jersey litigation privilege, SKP is precluded from referencing in its Counterclaims that Natreon sent a cease and desist letter to SKP, or that Natreon has previously threatened to file suit against SKP.[9]  The Court concludes that the New Jersey litigation privilege is not applicable.

Under the litigation privilege, "[a] statement made in the course of a judicial proceeding is absolutely privileged and wholly immune from liability."  Williams v. Kenney, 379 N.J. Super. 118, 133 (App. Div. 2005); see Chambers v. Wells Fargo Bank, N.A., No. 15-6976, 2016 U.S. Dist. LEXIS 83580, at *26 (D.N.J. Jun. 28, 2016).  This privilege is applied to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  Williams, 379 N.J. Super. at 134 (internal quotation marks and citation omitted).  The New Jersey Supreme Court has stressed that the privilege "is not limited to statements made in a courtroom during a trial," but rather, "extends to all statements or communications in connection with the judicial proceeding."  Hawkins v. Harris,

---

[9] Natreon requests that the Court strike the following statements from the Counterclaims: ¶ 119 ("threatening litigation against SKP"); ¶ 120 (that Raju "demand[ed] that SKP cease and desist from selling KSM-66"); ¶ 121 ("Natreon never pursued any patent infringement claims against SKP"); ¶ 126 ("false allegations" against SKP as "unfair competition"), ¶ 127 (allegation that Natreon "threatened litigation" and attorney "wrote a cease and desist letter"), ¶ 128 (that Natreon sent a cease and desist letter); and, ¶ 129 ("using litigation or threats of litigation").

141 N.J. 207, 216 (1995); see Williams, 379 N.J. Super. at 134 (stating that the privilege applies to "settlement negotiations and private conferences.").

However, Natreon misapplies this privilege, here. The New Jersey litigation privilege protects jurors, witnesses, parties and their attorneys from suit for statements made throughout the course of a judicial proceeding. See Williams, 379 N.J. Super. at 134 (the purpose of the privilege is to allow persons "to speak and write freely without fear of liability."); see also Loigman v. Twp. Comm., 185 N.J. 566, 588 (2006). Indeed, the New Jersey Supreme Court has stated that persons must be free to conduct litigation "without the distraction of a vindictive lawsuit looming on the horizon." Loigman, 185 N.J. at 588; see Peterson v. Ballard, 292 N.J. Super. 575, 579-80 (App. Div.), certif. denied., 147 N.J. 260 (1996) (applying the litigation privilege in dismissing claim arising from comments made by an attorney during an interview of a witness in anticipation of litigation). Here, it is clear from the Counterclaims that the cease and desist letter and the threats of litigation are not the basis for this litigation. In other words, SKP is not attempting to use these allegations as the foundation for its Counterclaims under § 43(a) of the Lanham Act and common law unfair competition. Instead, SKP has asserted these allegations to provide background information and procedural history between the parties. Accordingly, the Court concludes that the litigation privilege does not operate to bar all references in the Counterclaims to the cease and desist letter and threats of litigation.[10]

**ii.**      **References to Price Collusion, Internal Pricing Decisions and Deceptive Conduct**

---

[10] Natreon does not provide any other argument as to why these allegations should be stricken from the Counterclaims, nor does Natreon specifically argue that these allegations are inflammatory, confusing or collateral. Because Natreon does not advance any alternative arguments, and because the litigation privilege is inapplicable, the Court has no other basis to strike these particular allegations.

Natreon argues that the Court should strike three types of allegations as inflammatory, confusing and collateral from the Counterclaims: (i) allegations about price collusion; (ii) internal pricing decisions; and (iii) deceptive conduct.[11]  Specifically, Natreon argues that allegations "regarding a purported attempt by principals at Natreon to collude with SKP on product pricing" are improper.  See Natreon's Br. at p. 9.  Additionally, Natreon contends that the Court should strike "conclusory allegations that [it] purportedly marks its product up by an exorbitant '500 percent' and therefore charges a 'substantial premium' for its products."  Id. at p. 10.  Finally, Natreon maintains that allegations about "Natreon employees having purportedly disguised themselves as someone else for the purpose of obtaining 'confidential information from SKP" should be struck.  Id. at p. 10-11.

As discussed surpa, courts disfavor motions to strike "because this drastic remedy often is sought by the movant simply as a dilatory or harassing tactic."  Zarichny v. Complete Payment Recovery Servs., 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015) (internal quotation marks and citation omitted); see Vazquez v. Triad Media Solutions, Inc., No. 15-7220, 2016 U.S. Dist. LEXIS 3912, at *10 (D.N.J. Jan. 13, 2016) (same).  Indeed, courts are advised not grant a motion to

---

[11] With respect to price collusion and internal pricing decisions, Natreon requests that the Court strike the following statements: ¶ 98 ("500% markup"); ¶ 103 ("charge a substantial premium" and "attempted to collude with SKP"); ¶ 104 ("implicitly colluded on pricing"); ¶ 117 ("500% markup" and Natreon charged "a substantial premium over competing products"); ¶ 118 (that Natreon experienced increased sales); ¶ 119 ("exorbitant premium that it charges"); ¶ 123 (Raju telling SKP to "charge a higher price... thereby proposing implicit price collusion"); ¶ 124 (Raju telling SKP that "he would have no hesitation in ending his exclusive distribution agreement" with another company).

In connection to deceptive conduct, Natreon requests that the Court strike the following statements in the Counterclaims: ¶ 131 (Raju sending an email to SKP "disguising himself" as another person); ¶ 132 (Abedon posing as a "prospective customer" and "collected confidential information"); and, ¶ 133 (Hernandez "providing a business card from another company" and speaking with someone "to obtain confidential information").

strike "unless the moving party shows that 'the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" Eisai Co. v. Teva Pharm. USA, Inc., 629 F. Supp. 2d 416, 425 (D.N.J. 2009), as amended, (July 6, 2009) (quoting Garlanger, 223 F. Supp. 2d at 609). Importantly, "courts should not use a Rule 12(f) motion to determine disputed and substantial questions of law." Id. (internal quotation marks and citation omitted).

On this motion, the Court cannot find that SKP's allegations, as set forth above, have no possible relation to its Counterclaims under § 43(a) of the Lanham Act and common law unfair competition, since "it is clear from the length of the substantive arguments made that not all of the legal issues have yet been fleshed out in this case." Hitachi Cable Am., Inc. v. Wines, No. 85-4265, 1986 WL 2135, at *6 (D.N.J. Feb. 14, 1986); see Eisai Co., 629 F. Supp. 2d at 425. Although Natreon contends that SKP's allegations may support a claim for antitrust violation or common law misappropriation of trade secrets, Natreon has not supplied the Court with any legal authority to support the position that SKP's allegations are not capable of forming the basis of SKP's Counterclaims; or, at the very least, "possibly serv[ing] to achieve a better understanding of [those Counterclaims]." Eisai Co., 629 F. Supp. 2d at 425. Rather, Natreon conclusorily argues that SKP has asserted "[m]ultiple allegations have no relation to the Counterclaim[s] at all, and quite frankly, reflect cruelly upon the moral character of principals at the plaintiff company." Natreon's Br. at p. 7. However, at this juncture of the case, this Court is unwilling to undergo an analysis of potentially disputed and substantial questions of fact and law, on behalf of Natreon, to determine whether such allegations support, or bear any relation to, the Counterclaims under the Lanham Act and common law unfair competition. See Eisai Co., 629 F. Supp. 2d at 425. It is not the role of this Court to make legal arguments for the parties.

Indeed, on the face of the allegations, they do appear to be relevant to the Counterclaims, specifically the claim for unfair competition. Accordingly, since motions to strike are highly disfavored, and Natreon has not established that the allegations have no possible relation to the controversy, the Court denies the motion to strike those allegations.

## IV.     CONCLUSION

For the reasons set forth above, Natreon's partial motion to dismiss the Counterclaim for violation of the NJCFA is **GRANTED**; and, Natreon's motion to strike is **GRANTED** in part and **DENIED** in part as follows: (i) the motion to strike the Eighth Affirmative defense for failure to mitigate damages is **GRANTED**, but (ii) Natreon's motion, joined by NutraGenesis, to strike certain allegations as inflammatory, confusing and collateral is **DENIED**. Finally, the Court will administratively terminate NutraGenesis' motion to dismiss the Third-Party Complaint.

DATED: July 21, 2017                                    /s/ Freda L. Wolfson
                                                       The Honorable Freda L. Wolfson
                                                       United States District Judge